CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

May 05, 2026

LAURA A. AUSTIN, CLERK
BY: /s/ M. Poff
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION**

| | | |
|---|---|---|
| **JERRY WAYNE REMINES,** | ) | |
| Petitioner, | ) | **Case No. 6:25-cv-00105** |
| v. | ) | |
| | ) | **By: Michael F. Urbanski** |
| **JOSEPH W. WALTERS,**[1] | ) | **Senior United States District Judge** |
| Respondent. | ) | |

**MEMORANDUM OPINION**

Jerry Wayne Remines, a Virginia inmate proceeding with counsel, commenced this action by filing a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The petition challenges the validity of Remines' 2021 convictions in the Circuit Court of Halifax County. The respondent has filed a motion to dismiss to which Remines has responded, making the matter ripe for disposition. After reviewing the record, the court concludes that the respondent's motion must be granted.

**I.     Background**

**A.  State Court Proceedings**

On June 28, 2021, Remines was sentenced to an active term of imprisonment of 20 years after being found guilty at a bench trial of one count of possession of child pornography and ten counts of possession of child pornography, second or subsequent offense, in violation

---

[1] Pursuant to Rule 2(a) of the Rules Governing Section 2254 Cases, "the petition must name as respondent the state officer who has custody" of the petitioner. That officer is Joseph W. Walters, the current Director of the Virginia Department of Corrections. Thus, Walters is the proper respondent, and the Clerk shall update the docket accordingly.

of Virginia Code § 18.2-374.1:1.[2] Remines appealed these convictions to the Court of Appeals of Virginia, which affirmed on December 20, 2022. Remines filed a petition for rehearing en banc which was denied on January 24, 2023. He then filed a petition for appeal in the Supreme Court of Virginia, which was denied on June 9, 2023.

On June 4, 2024, Remines filed a state habeas petition in the Circuit Court of Halifax County, raising the following claims:

> (1) That his due process rights were violated because of the involvement of Detective Tiffany Bratton who was later convicted of misdemeanor embezzlement; and

> (2) That he received ineffective assistance of counsel where counsel failed to argue for a change of venue.

ECF No. 8-6, at 2. The circuit court denied the petition without an evidentiary hearing on September 30, 2024.

On December 18, 2024, Remines moved in the circuit court for leave to file a late notice of appeal to the Supreme Court of Virginia. He also filed a similar request in the Supreme Court of Virginia. On December 30, 2024, Remines filed a petition for appeal in the Supreme Court of Virginia, which petition the respondent moved to dismiss as untimely. On April 29, 2025, the Supreme Court of Virginia granted the respondent's motion and dismissed Remines' appeal as untimely.

**B. Remines' Claims**

On December 3, 2025, Remines executed the instant petition for habeas corpus relief

---

[2] Remines also pleaded guilty to using a computer to make an unauthorized copy of computer software or data. See Remines v. Commonwealth, No. 0737-21-2, 2022 WL 17813264, at *1 n.2 (Va. Ct. App. Dec. 20, 2022). But he did not appeal this conviction nor raise it in a state collateral proceeding, and it is not at issue here.

under 28 U.S.C. § 2254. Remines asserts the following claims in federal court:

> (1) That the state habeas court erred in denying Remines' due process claim because Bratton's conviction and involvement in his case "taint[ed]" the prosecution's evidence; and

> (2) That there was insufficient evidence to sustain his convictions for possession of child pornography.

Pet., ECF No. 1, at 18–25.

### C. Findings of Fact by the Court of Appeals of Virginia[3]

Remines operated an electronics repair business, Airborne Electronics Repair, out of his home. In the fall of 2019, South Boston Police Department Corporal Adam Whitmore brought his phone to Remines to fix a broken screen. Remines said the screen was not repairable, and Whitmore purchased a new phone. When Whitmore downloaded his cloud data to his new phone, he saw several text messages sent from his phone number to a number associated with Airborne Electronics Repair. These messages were sent after Whitmore had dropped his phone off for repair with Remines, without Whitmore's permission or knowledge, and included photographs of Whitmore's wife in "states of undress" and an intimate video of Whitmore and his wife. Whitmore brought this information to the Department's attention, and South Boston Police Department Detective Tiffany Bratton obtained a search warrant for Remines's cell phone and "any computer hardware or software that is capable of data storage and handling."

When the police executed the search warrant at Remines's home, Remines came to the door holding his cell phone, an iPhone 8 Plus. Bratton took the phone and gave it to Special Agent Travis Barr of the Virginia State Police, who secured the device. Bratton proceeded to interview Remines, who denied taking images from Whitmore's phone but said he may have backed up the phone's contents. He stated he used his own cell phone for both personal and business purposes. He refused to provide his passcode to unlock the phone, claiming there was "confidential information inside the phone."

---

[3] These factual findings were made by the Court of Appeals of Virginia when it affirmed Remines' convictions. See Remines, 2022 WL 17813264, at *1-3. These facts are entitled to deference in federal court. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Barr testified at trial as an expert in digital examination and analysis. Upon receiving Remines's phone, Barr put it in "airplane mode" and changed the settings so it would not go to sleep. He immediately noticed a TOR browser, which permits a user to browse the "dark web." He transported the phone, along with other recovered devices, to a secure location for analysis. Barr connected the phone to "GreyKey," which permits law enforcement to collect data from a locked device. The resulting zip file, containing the phone's contents, can then be indexed and analyzed by other programs. While searching for Whitmore's photos, Barr came across child pornography. He also noted a browser bookmark for "young lolita lesbians."

Barr provided the devices and extracted material to Special Agent James Trogdon of the Virginia State Police's computer evidence recovery section, who also testified at trial as an expert in digital forensic examination and analysis. Trogdon noted several things that connected Remines to the device: the phone's device display name was registered as "Airborne Electronics Repair," and there were multiple emails using "masstech" and "phonerepair22@gmail.com," with the email contact name being "Jerry R."

Trogdon's analysis found that "the bulk of" the child pornography was from three different applications ("apps"): MEWE (a social networking app), VK (a Russian social networking app), and Mega (a cloud storage provider). The MEWE app indicated that Remines accessed it with the username "tlbytes" or "littletlbytes." Cached photos associated with the MEWE app included images of Remines and his wife, Remines in military uniform, a race car with a "Airborne Electronics Repair" decal on the bumper, and Remines's family tree.

The MEWE app data also included group memberships and chat history regarding the searching for and dissemination of child pornography. Remines was the moderator/administrator—meaning he could approve or deny new members or ban existing members—of one of these groups. It had a series of "yes or no" questions a user must answer in order to join, each of which the "tlbytes" user responded to in the affirmative. These questions included:

> • Do you agree to post content whether forbidden or just plain sexy taboo content so that everyone in the group can enjoy it[?]
>
> • [T]o ensure that the group . . . hangs around for a while, do you agree to put any underage or extreme porn content on timers[?]
>
> • [B]y joining the group, do you agree not to report any content [of] this group no matter what . . . pics, gif[s], videos, links or comments [are] posted . . .[?]
>
> • [I]f you choose to join this group, you are admitting that you

4

> are a sick, perverted fuck that enjoys filling the void of his/her
> life with the most devious porn known to the internet. Agree[?]

The chat history for the MEWE app "tlbytes" account included messages sent to another user about finding and joining groups. These messages included: "What the fuck wrong with these morons they can insert a fucking three inch diameter wine bottle up a pussy and ass but go crazy about the word incest"; "Are there any incest groups on here?"; and "Feel free to add me to any of your taboo or young groups."

The VK app cache data contained five images depicting child pornography. These images were downloaded on November 29, 2018, September 7, 2019, and November 18, 2019. The VK app had been downloaded by the user of the phonerepair22@gmail.com email address.

The Mega app cache contained the "majority of" the child pornography. The Mega app provides cloud storage, allowing a user to store their files for future access and to create links to share with others. Trogdon identified 919 media files, and at least 96 images, depicting child pornography in the Mega app data. The images were in a "thumbnailsV3" folder, which Trogdon explained would only occur if a user clicked on the image. All but one file indicated a "created date," which Trogdon described as the "date in which that artifact was created on the device," between August 24, 2019, and October 12, 2019. The app data also contained a video depicting child pornography with a created date of October 8, 2019. Trogdon testified that "[i]n order for the video file to arrive in the temporary location, it would have had to have been clicked and played through the Mega application."

The phone data also indicated that Remines used a virtual private network, or VPN, when accessing these apps and images. This would disguise Remines's actual IP address and location in South Boston, and display IP addresses in other locations (such as Guadalajara, Mexico), providing additional anonymity and privacy protection.

Remines, 2022 WL 17813264, at *1–3.

## II.    Discussion

### A.  Statute of Limitations

The respondent first argues that Remines' petition is untimely. Br. Supp. Mot. to Dismiss, ECF No. 8, at 5–7. Remines concedes that his petition is untimely but argues that he "is actually innocent of the charges at issue here," and that the court can accordingly "reach

the merits of his petition[.]" Pet., ECF No. 1, at 6.  Despite Remines' concession, the court will independently assess the timeliness of his petition.

Under 28 U.S.C. § 2244(d)(1), a one-year period of limitation applies to federal habeas petitions filed by state prisoners. The period runs from the latest of the following dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Id.

Under subsection (A), the one-year period began to run from the date on which Remines' judgment of conviction became final. "For petitioners who pursue direct review all the way to [the United States Supreme Court], the judgment becomes final at the 'conclusion of direct review'—when [that] Court affirms a conviction on the merits or denies a petition for certiorari." Gonzalez v. Thaler, 565 U.S. 134, 150 (2012) (quoting 28 U.S.C. § 2244(d)(1)(A)). For all other petitioners, like Remines, "the judgment becomes final at the 'expiration of the time for seeking such review'—when the time for pursuing direct review in [the Supreme] Court, or in state court, expires." Id. (quoting § 2244(d)(1)(A)). The Supreme Court of Virginia denied Remines' petition for appeal on June 9, 2023. Consequently, his conviction

6

became final 90 days later, on September 7, 2023, when his time to seek review in the United States Supreme Court expired. See Sup. Ct. R. 13(1) (requiring an appellant to file a petition for writ of certiorari 90 days after entry of judgment). Although the one-year period of limitation was tolled during the time in which the state habeas proceedings were "pending," 28 U.S.C. § 2244(d)(2), Remines waited until June 4, 2024, or 271 days later, to file his state habeas petition, which was denied on September 30, 2024. This left Remines with 95 days to file the instant petition.[4] And although Remines requested leave to file a late appeal of the denial of his state habeas petition, the Supreme Court of Virginia denied this request as untimely.[5] Accordingly, the one-year limitation period under § 2244(d)(1)(A) expired on January 3, 2025. But Remines waited until December 3, 2025, to file the instant petition, making it untimely under § 2244(d)(1)(A) by 334 days.

Remines does not allege that any unconstitutional state action prevented him from filing a habeas corpus petition. Nor does he seek relief based on a newly recognized constitutional right. Accordingly, subsections (B) and (C) of § 2244(d)(1) do not apply. However, Remines does reference certain alleged "new evidence" of his innocence, which presumably implicates subsection (D). Specifically, Remines notes that Detective Tiffany Bratton, the "lead detective" in his case, was subsequently convicted of embezzlement. Pet.,

---

[4] The year 2024 was a leap year.

[5] Because Remines' attempt to seek review of the denial of his state habeas petition was itself untimely, it did not toll any portion of the limitations period. See 28 U.S.C. § 2244(d)(2) (providing that "[t]he time during which a properly filed application for State post-conviction . . . review" tolls the one-year limitations period) (emphasis added); Baptist v. Dotson, Case No. 2:24-cv-00012, 2025 WL 692356, at *2 (E.D. Va. Mar. 4, 2025) ("[T]he definition of 'properly filed' state collateral proceedings, as required by § 2244(d)(2), is based on the applicable state law as interpreted by state courts[.]") (citing Pace v. DiGuglielmo, 544 U.S. 408, 417 (2005)); Allen v. Siebert, 552 U.S. 3, 7 (2007) (per curiam) ("Because . . . [the] petition for state postconviction relief was rejected as untimely by the [state] courts, it was not 'properly filed' under § 2244(d)(2).").

ECF No. 1, at 6. But Remines referenced this conviction in his state habeas petition which he filed on June 4, 2024. The circuit court denied Remines' petition on September 30, 2024, and he filed the instant petition on December 3, 2025. Accordingly, the petition is untimely by at least 63 days even under § 2244(d)(1)(D).

For these reasons, Remines' claims are time-barred.

## B. Actual Innocence

As noted above, Remines concedes that the petition is untimely. Pet., ECF No. 1, at 6. Regardless, he states that the court can nevertheless reach the petition's merits because he is "actually innocent" of his crimes of conviction. Id.

"In Schlup v. Delo, [513 U.S. 298 (1995),] the Supreme Court recognized that a showing of actual innocence can serve as a gateway . . . to secure the adjudication of [a § 2254 petitioner's] otherwise defaulted constitutional claims." Wolfe v. Dotson, 144 F.4th 218, 233 (4th Cir. 2025) (internal quotation marks omitted). "In McQuiggin v. Perkins, [569 U.S. 383 (2013),] the Supreme Court expanded the Schlup actual innocence exception to also proceed in the face of the statutory time bar" in 28 U.S.C. § 2244(d). Id. (internal quotation marks omitted). "[T]he Schlup standard is demanding, and permits review only in extraordinary cases." Teleguz v. Zook, 806 F.3d 803, 809 (4th Cir. 2015) (internal quotation marks omitted). To meet this standard, a petitioner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." Wolfe, 144 F.4th at 233 (quoting Schlup, 513 U.S. at 324). Moreover, the petitioner must "demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt[.]" Id. (quoting Teleguz v. Pearson, 689 F.3d 322, 329 (4th Cir. 2012)).

8

"[A]ctual innocence means factual innocence, not mere legal insufficiency." United States v. Green, 67 F.4th 657, 671 (4th Cir. 2023) (internal quotation marks omitted).

Remines claims that Bratton's embezzlement conviction is new evidence of his actual innocence. As Remines notes, Bratton was promoted in April 2021, and in her new role was "tasked with custody of the property and evidence room, which contained a safe with bags of money in it." Pet., ECF No. l, at 14. In September 2021, Bratton was charged and later convicted of embezzlement after $14,600 was discovered missing from the safe and surveillance footage showed Bratton "stuff[ing] bags [of money from the safe] into her shirt." Id. at 14-15. According to Remines, because Bratton was convicted of "a crime of moral turpitude, her testimony, much of which was demonstrated false, is unreliable." Id. at 17. He further claims that Bratton's "intimate and extensive involvement in this case taint[ed] the entirety of the Commonwealth's evidence." Id. Furthermore, Remines claims that the "testimony of several law enforcement officers in this case was inconsistent and suspect," noting that "defense counsel's strategy clearly included implying or demonstrating that law enforcement had the opportunity to manipulate the iPhone's data[.]" Id. at 18.

Remines has not met the "demanding" burden of showing his actual innocence under Schlup. See Zook, 806 F.3d at 809. As an initial matter, Remines' citation to alleged inconsistencies with the officers' testimony, which he claims was suspicious, is insufficient to show his actual innocence. For example, Remines notes that in March 2020, Bratton testified that after she seized Remines' phone, she gave it to Special Agent Travis Barr of the Virginia State Police (VSP) and personally observed Barr put the phone in airplane mode and place it in a bag. Pet., ECF No. 1, at 8. But after Remines discovered home surveillance video showing Bratton hand the phone to Barr and then enter Remines' home "where she could no longer

9

observe what happened," her testimony at trial changed. Id. at 8–9. Additionally, Remines notes that "Barr testified that he did two data dumps from the iPhone, one in 2019 shortly after Remines' arrest and one in March 2020." Id. at 9. But "[a] comparison of the two downloads shows that there was an unexplained 15GB increase of data on the iPhone between the two downloads." Id.

To show actual evidence under Schlup, a petitioner must identify "new evidence that was not available to the defendant at the time of the trial." Formica v. Clarke, No. 7:19-cv-00039, 2020 WL 3840427, at *4 (W.D. Va. July 8, 2020) (emphasis added); see also Schlup, 513 U.S. at 324 (to prove actual innocence, a petitioner must put forth "new reliable evidence . . . that was not presented at trial.") (emphasis added). As these issues were known to Remines at his trial, they are not new evidence of his actual innocence. Moreover, as noted below, there was sufficient testimony presented at trial whereby the factfinder could, and presumably did, reasonably determine that the officers did not manipulate the phone's data.

Remines' reliance on Bratton's embezzlement conviction fares no better. To begin with, "new evidence must do more than undermine the finding of guilt[.]" Hoskinson v. Dep't of Corr., No. 1:22-cv-01406, 2023 WL 5552797, at *4 (E.D. Va. Aug. 28, 2023) (citing Phillips v. Ferguson, 182 F.3d 769, 774 (10th Cir. 1999)). Instead, "it must affirmatively demonstrate innocence." Id. Here, Bratton's conviction, at best, merely undermines the circuit court's guilty finding as to Remines, and therefore does not constitute new, reliable evidence of his actual innocence. See id. Moreover, Remines provides nothing beyond speculation that Bratton's involvement in his case "taint[ed] the entirety of the Commonwealth's evidence." Pet., ECF No. 1, at 17. He has not shown, for example, that Bratton's embezzlement conviction—which was based on events that occurred after Remines was already found guilty—suggests that the

officer did anything untoward regarding his case. Cf. Williams v. Brown, 208 F. Supp. 3d 713, 735 (E.D. Va. 2016) (finding allegations that a detective "fed [a witness] a story" that was false fell "squarely in line with [the detective's] conduct" in other cases in which the detective had a "proven history of eliciting false confessions . . . [and] manipulating the criminal justice system for financial gain" and that such evidence further supported the conclusion that the petitioner's admissions of guilt were false). Remines' "speculation [regarding Bratton] is insufficient to meet the heavy burden" of showing actual innocence. Hayes v. Carver, No. 1:16-cv-01100, 2017 WL 2842781, at *9 (M.D.N.C. July 3, 2017) (quoting O'Boyle v. Ortiz, 242 F. App'x 529, 531 (10th Cir. 2007)), report and recommendation adopted, 2017 WL 4402520 (M.D.N.C. Sept. 30, 2017).

Otherwise, Remines attempts to use Bratton's embezzlement conviction to impeach her testimony. As the Supreme Court has noted, however, "latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever," be sufficient to show actual innocence. Sawyer v. Whitley, 505 U.S. 333, 349 (1992). Indeed, for such impeachment evidence to establish actual innocence, a court would "have to assume, first, that there was little evidence [of the crimes at issue] apart from the [impeached witness's testimony], and that the [factfinder] accepted [that witness's] testimony without reservation." Calderon v. Thompson, 523 U.S. 538, 563 (1998). Such is not the case here.

At trial, Barr testified that after receiving Remines' iPhone from Bratton, he placed the phone in airplane mode, changed the phone's settings so that it would not go to sleep, and scrolled through the phone's applications. Trial Tr., ECF No. 8-14, at 108–13. Special Agent Joe Edgell testified that he stood next to Barr as he examined the phone, and stated that Barr did not "add, remove, [or] change in any way" the data on the phone. Id. at 96–98. Barr, who

was certified as an expert at trial, also testified that if there had been any changes to the data on the phone, such changes would have been identified in the data provided by law enforcement's forensic tools. Id. at 127. On cross examination, Barr identified the discrepancy in the sizes of the downloads of data from the phone but was not asked to explain the significance of such discrepancy. Id. at 129–30. Moreover, Special Agent James Trogdon, the prosecution's chief expert witness, testified that there were no "additions, corrections, [or] deletions" of data from the phone on the day of the seizure or since. Id. at 206–07.

Barr testified that, upon his initial review of Remines' phone, he noticed a TOR browser which permits users to access the "dark web."[6] Id. at 111. Barr transported the phone, along with other devices seized from Remines' home, to a secure location for analysis. Id. at 114. There, Barr connected the phone to "GreyKey," which permits law enforcement to collect data from devices for further analysis using other programs. Id. at 115–17. While searching for Officer Whitmore's photos, Barr came across child pornography as well as a browser bookmark for "young lolita lesbians." Id. at 117–20. Barr provided the extracted phone data to Trogdon, who further analyzed the phone's contents. Id. at 122.

Upon analyzing the phone's data, Trogdon noticed several things that connected the device to Remines, such as (i) that the phone's display name was registered as "Airborne Electronics Repair" and (ii) that there were multiple emails from "masstech" and "phonerepair22@gmail.com" with the email contact name being "Jerry R." Id. at 145. Trogdon testified that "the bulk of" the child pornography found on the phone was from

---

[6] Barr clarified that the dark web is the "part of the internet that [cannot] be accessed by . . . Google or Facebook, things like that." Id. at 112.

three different applications: MEWE (a social media and chat application), VK (a Russian social networking application), and Mega (a cloud storage provider). Id. at 152–53, 175, 182–83.

Trogdon testified that the account name associated with the MEWE application was "tlbytes" and/or "littletlbytes," and that he discovered on the phone a Google Drive account containing a folder labelled "littletlbytes." Id. at 153–54. In the littletlbytes folder, Trogdon discovered various photos, including one of Remines "in military uniform with a MEWE watermark." Id. at 154–58. In the application data, Trogdon discovered group membership and chat history associated with the tlbytes account. Id. at 158–74.  One of the groups had a series of "yes or no" questions for users to answer before joining.  Id. at 158. The tlbytes user responded "yes" to each question, including one which asked: "to ensure that the group . . . hangs around for a while, do you agree to put any underage or extreme porn content on timers[?]." Id. at 160–67. The chat history associated with the tlbytes account included various messages sent to another user, such as "feel free to add me to any of your taboo or young groups." Id. at 172–74.

As to VK, Trogdon testified that the application's cache data contained five images depicting child pornography. Id. at 175–78. He further testified that the images were accessed or downloaded on the following dates: November 29, 2018; September 7, 2019; and November 18, 2019. Id. at 178–80. Trogdon also testified that the VK application was purchased by someone using the "phonerepair22@gmail.com" email account. Id. at 178–79.

Regarding Mega, Trogdon testified that the application "was where the majority of the child pornography was located." Id. at 183. Trogdon explained that Mega is a "cloud storage provider" through which users "can store their data . . . [or] generate" links to share data with others. Id. Trogdon testified that he discovered 96 images depicting child pornography in the

13

Mega application data. Id. at 184. He further testified that at least some of these images were stored in a "previewsV3" cache folder and explained that an image would only be stored there if a user had clicked on the image or viewed it in full screen.[7] Id. at 197–99. Trogdon testified that all but one of the images had a "creation date" between August 24, 2019, and October 12, 2019, which Trogdon described as the "date in which that artifact was created on the device." Id. at 184–85, 187. The Mega application data also contained a video file depicting child pornography with a created date of October 8, 2019, which was stored in a "temporary location." Id. at 186–87. Trogdon explained that "[i]n order for the video file to arrive in the temporary location, it would have had to have been clicked and played through the Mega application." Id. at 188.

Finally, Trogdon testified that Remines often used a virtual private network (VPN) when accessing these applications, images, and videos. Id. at 204–06. As Trogdon explained, a VPN "allows a user to change their device[']s IP address and in doing so, change [their] location by connecting to a server in another locality or another [c]ountry." Id. at 204; see also United States v. Fisher, No. 2:17-cr-00073, 2019 WL 3310508, at *7 (D. Nev. Mar. 28, 2019) ("A person engaging in the illegal transmission of child pornography might well choose to do

---

[7] In his petition, Remines notes the undisputed fact that he could not "access, review, or alter [the cache folders] without software he did not possess." Pet., ECF. No. 1., at 5. But the prosecution did not claim that Remines could access the cache files. Instead, Trogdon testified that the images at issue would only be stored in the previewsV3 folder if a user had clicked on the image or viewed it in full screen. Under Virginia law, "each time [an individual] intentionally [seeks] out and view[s] child pornography with his Web browser[,] he knowingly acquire[s] and possesse[s] the images." Remines, 2022 WL 17813264, at *4 (quoting Kromer v. Commonwealth, 45 Va. App. 812, 817, 613 S.E.2d 871, 874 (2005)). Remines notes that his expert witness, Patrick Eller, testified that an image would not necessarily need to be clicked on to appear in the previewsV3 folder. Pet., ECF No. 1, at 14. But "[t]he factfinder in this case was presented with a classic 'battle of the experts' and was entitled to judge 'the weight and credibility to be given to their testimony.'" Washington v. Clarke, No. 2:17-cv-00231, 2018 WL 11694708, at *11 (E.D. Va. Oct. 15, 2018) (quoting Hoebelheinrich v. Hoebelheinrich, 43 Va. App. 543, 552-53, 600 S.E.2d 152, 156 (2004)), report and recommendation adopted, 2019 WL 1247512 (E.D. Va. Mar. 18, 2019).

so through a VPN IP address in order to conceal his or her actual IP address and identity."),
report and recommendation adopted as modified, 2019 WL 2419456 (D. Nev. June 10, 2019).

Accordingly, there was significant evidence apart from Bratton's testimony that established Remines' guilt. Because Remines has failed to show that, considering his new evidence, "it is more likely than not that no reasonable juror would have convicted him[,]" he has not met the actual innocence standard under Schlup. McQuiggin, 569 U.S. at 390.

For these reasons, Remines' petition is untimely, and he has not shown actual innocence under Schlup to excuse such untimeliness. Therefore, his petition will be denied.[8]

### III.   Conclusion

For the above reasons, the court will grant the respondent's motion to dismiss and dismiss Remines' petition. Additionally, because Remines has not "made a substantial showing of the denial of a constitutional right," see 28 U.S.C. § 2253(c)(2), or that the court's procedural rulings are debatable among reasonable jurists, see Slack v. McDaniel, 529 U.S. 473, 484 (2000), the court will deny a certificate of appealability. An appropriate order will be entered.

---

[8] Having concluded that Remines' petition is untimely and that he has not shown his actual innocence, the court need not, and will not, address the respondent's other bases for dismissal. And although Remines has requested an evidentiary hearing and further discovery, Pet., ECF No. 1, at 26, these requests are denied. "A district court is prohibited from holding an evidentiary hearing when an applicant has failed to develop the factual basis of a claim in state court unless the claim relies on a new rule of constitutional law or 'a factual predicate that could not have previously been discovered by the exercise of due diligence.'" Priest v. Stirling, No. 1:21-cv-02878, 2022 WL 2663487, at *3 (D.S.C. July 11, 2022) (quoting 28 U.S.C. § 2254(e)(2)(A)). Remines does not identify any new rule of constitutional law that applies, and the only new evidence of his actual innocence that he cites is Bratton's conviction. But to show entitlement to an evidentiary hearing, "[t]he applicant must also demonstrate, by clear and convincing evidence, the new facts will establish 'that no reasonable factfinder would have found the applicant guilty of the underlying offense.'" Id. (quoting 28 U.S.C. § 2254(e)(2)(B)). The court already determined that Remines failed to make this showing regarding Bratton's conviction. Additionally, because Remines has failed to show his actual innocence, the court will not reach his underlying claims on the merits and therefore sees no reason to grant Remines an evidentiary hearing on those claims. And because the court will dismiss Remines' petition, his request for further discovery is denied as moot.

Entered: May 4, 2026

Michael F. Urbanski
U.S. District Judge
2026.05.04
17:16:18 -04'00'

Michael F. Urbanski
Senior United States District Judge